**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**March 11, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 04-70015

MILTON WUZAEL MATHIS,

Petitioner-Appellant,

versus

DOUGLAS DRETKE, Director,
Correctional Institutions Division,
Texas Department of Criminal Justice,

Respondent-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

(03-CV-1138)

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

PER CURIAM:[*]

Petitioner-Appellant Milton Mathis ("Mathis") was convicted of capital murder and sentenced

to death for the 1998 murder of Travis Brown and Daniel Hibbard. He now seeks a certificate of

appealability ("COA") from the district court's denial of his petition for a writ of habeas corpus

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

pursuant to 28 U.S.C. § 2254.  We deny Mathis' request for a COA on each issue.

FACTUAL AND PROCEDURAL HISTORY

A grand jury indicted Mathis for the capital murder of more than one person during the same criminal transaction under Texas Penal Code § 19.03(a)(7).  Mathis was represented at trial by Steven Rosen and Pheobe Smith (hereinafter "trial counsel").  The Texas jury found Mathis guilty of capital murder as charged in the indictment and further answered Texas' special issues in a manner that required imposition of a death sentence.  As summarized by the Texas Court of Criminal Appeals on direct review, the facts are as follows:

> On December 15, 1998, at approximately 8:00 or 8:30 a.m., Esmerelda Lester and her 15-year old daughter Melanie Almaguer went to Chris Lentsch's home [a known drug house]. Lentsch rented rooms to Travis Brown and Daniel Hibbard. Brown and appellant were in Brown's room. While Lester, Almaguer and Hibbard sat in Lentsch's room, Lentsch went into the kitchen. Shortly thereafter, Lentsch heard gunshots from Brown's room and turned to see appellant exiting the room with a gun in his hand. Appellant claimed that Brown had just shot himself. Lentsch told appellant to put the gun down, but appellant ordered Lentsch and the other three back into Lentsch's room where he calmly walked up to Almaguer and shot her in the head, leaving her alive, but  paralyzed from the neck down. Appellant then shot Hibbard in the head, causing his death. Appellant finally pointed the gun at Lester, whereupon he discovered that he was out of bullets. Appellant thereafter rummaged through the house, set fire to Brown's room, threatened Lester and Lentsch, and finally left in Brown's car.
> The police identified appellant as the killer and went to arrest him. Upon being arrested, appellant became violent. Officers discovered that appellant had told his father to lie for him and had persuaded his girlfriend to give him an alibi, which she maintained until confronted by the police. A fellow inmate testified that appellant showed no remorse for the shootings and stated that he wished he had killed them all. Appellant took the stand and at first testified that although he had been to the house earlier, he was not there on the morning of the shootings. After defense counsel requested a recess, appellant took the stand and stated that he had lied in his previous testimony. He then testified that he was at the house at the time of shootings, and admitted that he had shot all three people and taken Brown's car. Appellant claimed he shot Brown in self-defense after Brown had threatened to shoot him.  He claimed that he shot the others because he panicked after shooting Brown.

Mathis v. State, 67 S.W.3d 918, 921 (Tex. Crim. App. 2002) (footnote omitted).

On February 13, 2002, Mathis' conviction and sentence were affirmed on automatic direct appeal to the Texas Court of Criminal Appeals. Id. at 928. Mathis did not seek certiorari review in the Supreme Court. Mathis' state habeas proceedings were held concurrent to his direct appeal. The trial-level state habeas court issued findings of fact and conclusions of law recommending that Mathis' state habeas application be denied. On April 3, 2002, the Court of Criminal Appeals adopted the lower court's findings and conclusions and denied habeas review. Ex parte Milton Wuzael Mathis, No. 50,722-01 (Tex. Crim. App. April 3, 2002) (unpublished). On the same day, Mathis filed his application for a federal writ of habeas corpus in the Southern District of Texas, raising six points of error. Concomitantly, Mathis filed a successive state habeas petition asserting a claim under Atkins v. Virginia, 536 U.S. 304 (2002). His successive state habeas petition was dismissed by the Court of Criminal Appeals because a federal proceeding was pending. See Ex parte Soffar, 120 S.W.3d 344 (Tex. Crim. App. 2003) (noting Texas' long standing practice, based on abstention doctrine, of dismissing a second state habeas application if there is a pending federal proceeding). On February 2, 2004, the federal district court denied relief and denied COA *sua sponte*. Mathis v. Dretke, Civil No. H-03-CV-1138 (S.D. Tex. Feb. 6, 2004) (unpublished). Mathis submitted a motion for new trial and for abatement in the federal district court, requesting reconsideration and that the district court suspend federal proceedings pending completion of state proceedings. See Ex parte Soffar, 143 S.W.3d 804 (Tex. Crim. App. 2004) (holding that a successive state habeas petition may be considered if any concurrent federal proceedings are stayed pending completion of state proceedings). The district court denied his motion. Mathis now seeks a COA from this court.

STANDARD OF REVIEW

3

Mathis filed a notice of appeal in the instant case after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEPDA") therefore, his right to appeal is subject to the AEDPA's amended version of 28 U.S.C. § 2253. Lindh v. Murphy, 521 U.S. 320, 336 (1997) (stating that AEDPA applies to all habeas petitions pending after April 24, 1996).

Before an appeal may be entertained, a prisoner who was denied habeas relief must first obtain a COA from a circuit judge. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). Until a COA has been issued, a federal appeals court lacks jurisdiction to rule on the merits of a habeas appeal. Id. at 336. To obtain a COA, the petitioner must make a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, the petitioner must demonstrate "that reasonable jurists could debate whether [] the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

In determining whether to grant a COA, our inquiry is limited to a threshold examination that "requires an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El, 537 U.S. at 336. A full consideration of the merits is not required, nor permitted, by § 2253(c)(2). Id. The fact that a COA should issue does not mean the petitioner will be entitled to ultimate relief, rather "the question is the debatability of the underlying constitutional claim, not the resolution of that debate." Id. at 342. Accordingly, we must be mindful that "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." Id. at 337. At the COA stage, we do not apply the deferential AEDPA standard of review, found in 28 U.S.C. § 2254, for the merits

4

of the habeas petition.  Id. at 342 ("Before the issuance of a COA, the Court of Appeals had no jurisdiction to resolve the merits of petitioner's constitutional claims.").  Thus, our immediate task is to determine, not the ultimate merits of Mathis' claims, but only whether Mathis has demonstrated that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack, 529 U.S. at 484).

DISCUSSION

We turn first to Mathis' claim that the district court erred in denying his motion to stay proceedings.  A COA is not a prerequisite to review the denial of a motion to stay proceedings.  See 28 U.S.C. § 2254(a) (permitting federal courts to entertain applications for writ of habeas corpus for relief from a"judgment of a State court"); see also Dunn v. Cockrell, 302 F.3d 491, 492 (5th Cir. 2002) (stating that a COA is not required when an appeal does not implicate the merits of a district court's denial of a habeas petition).  Accordingly, we may consider the merits of Mathis' claim.  A district court's refusal to grant a stay in a habeas proceedings is reviewed for abuse of discretion.  Brewer v. Johnson, 139 F.3d 491, 493 (5th Cir. 1998) (citation omitted).

Because Mathis submitted his motion to stay proceedings after the final judgment dismissing his habeas petition, the district court concluded that the only matter left for it to stay was the time to file a notice of appeal.  The district court held that it did not have the power to extend the time to file a notice of appeal indefinitely.  We agree.  Notwithstanding Mathis' status as a prisoner, a federal habeas proceeding is a civil proceeding, Wilkens v.  Johnson, 238 F.3d 328, 330 (5th Cir.  2001), therefore, it is subject to Rule 4(a) of the Federal Rules of Appellate Procedure.  Rule 4(a)(5) constrains the district court's ability to extend the time to file a notice of appeal to either "30 days

5

after the prescribed time or 10 days after the date when the order granting the motion is entered."

FED. R. APP. P. 4(a)(5). To allow the district court to extend the time to file a notice of appeal for an indeterminate period, which is essentially what the district court would do if it granted a stay in this situation, would be wholly inconsistent with the language of the rules requiring an expeditious filing of a notice of appeal. Accordingly, it was not an abuse of discretion for the district court to deny Mathis' motion to stay proceedings.

We now turn to the other issues Mathis raises in his application for a COA, specifically, he raises five errors: that (1) the refusal to conduct a live evidentiary hearing in the state habeas proceeding violated his due process rights and interfered with the district court's ability to perform its function under § 2254; (2) the trial court violated his constitutional rights by refusing to give an instruction of manslaughter with respect to the killing of Daniel Hibbard; (3) the trial court erred in failing to conduct a competency hearing *sua sponte* at trial; (4) the prosecution violated his due process rights by withholding impeachment evidence relating to the State's witness Gregory Jackson; and (5) his trial counsel's representation at trial was ineffective and resulted in actual prejudice at his trial and sentencing. For the following reasons, we deny Mathis' request for a COA.

I.      Live Evidentiary Hearing

Mathis' raises two claims, which we have consolidated here, concerning the state habeas court's failure to hold a live evidentiary hearing before recommending that he be denied relief. Mathis argues that the failure to hold a live evidentiary hearing was a violation of his due process rights. Moreover, he contends that the inadequacies in the record interfered with the district court's ability to apply the proper review under § 2254. This latter argument seems to be related to the district court's duty, under § 2254, to afford a presumption of correctness to a State court's determination

6

of a factual issue. <u>See</u> 28 U.S.C. § 2254(e)(1). Stated another way, Mathis seems to argue that without a full hearing in the state court, the district court could not assume the state court's findings were correct and thereby, must conduct plenary review of the factual issues. Mathis argues that important factual issues still needed to be developed and absent a live hearing, the state court did not provide a sufficient record on which the district court could evaluate Mathis' arguments.

The district court concluded that Mathis did not exhaust his constitutional claim, that the denial of an evidentiary hearing violated his due process rights, in state court. Despite finding that Mathis' claim was procedurally barred, the district court nonetheless went on to consider the merits. The district court held that complaints about state habeas proceedings are not a basis for federal habeas relief and notwithstanding, the federal courts do not have the power to grant the relief Mathis sought, namely, ordering that state evidentiary proceedings be conducted. In addition, the district court rejected Mathis' argument that ADEPA's deferential review is applied only after state courts have conducted a full and fair hearing.

Mathis argues that in his "motion for hearing on issues raised in writ of habeas corpus," presented to the state habeas court, he stated that a denial of a hearing on the issue of ineffective assistance of counsel would be a due process violation. In addition, he asserts that he clearly indicated in the motion that his arguments were based on the Eighth and Fourteenth Amendments. Even assuming *arguendo* that Mathis' claim was exhausted in state court, we are not persuaded that a COA should be issued. It is well established that "infirmities in state habeas proceedings do not constitute grounds for federal habeas relief. We look only to the trial and direct appeal."[1] <u>Duff-</u>

---

[1] Mathis unsuccessfully tries to distinguish <u>Duff-Smith</u>, *supra*, and <u>Henderson v. Cockrell</u>, 333 F.3d 592 (5th Cir. 2003), by noting that, as opposed to the present case, federal court hearings were conducted in those cases. However, we find that distinction inconsequential. Furthermore,

7

Smith v. Collins, 973 F.2d 1175, 1182 (5th Cir. 1992). Moreover, Mathis' argument that any deficiencies in the record impeded the district court's ability to apply deferential review pursuant to § 2254, fails to recognize that ADEPA "jettisoned all references to a 'full and fair hearing' from the presumption of correctness accorded state court findings of fact." Valdez v. Cockrell, 274 F.3d 941, 949 (5th Cir. 2001). There is no requirement that a full and fair hearing be conducted before the district court may afford deference to the state court's factual findings.

II.     Lesser Included Offense Instruction

Next, Mathis argues that the trial court violated his constitutional rights by refusing to give an instruction to the jury on the lesser included offense of manslaughter with respect to the death of Daniel Hibbard, in accordance with Beck v. Alabama, 447 U.S. 625 (1980). The Supreme Court in Beck held that a death sentence imposed after a conviction of a capital offense is unconstitutional where the jury was prohibited from considering a verdict of guilty of a lesser included offense. "Subsequent decisions by this court have consistently held that a state trial court may not, under *Beck*, refuse a lesser-included-offense instruction if the jury could rationally acquit on the capital crime and convict for the noncapital crime." East v. Scott, 55 F.3d 996, 1005 (5th Cir. 1995) (internal quotation marks and citations omitted).

During the trial, Mathis testified that he shot Brown in self-defense because Brown was threatening to shoot him. He alleged that after he shot Brown, everyone else present in the house began "hollering and screaming." Mathis stated at trial that "I never aimed the gun. I just walked in there and heard them all screaming, and I was just pointing the gun and pulled the trigger. So I

---

while we may agree with the premise of Mathis' statement that a fair hearing should not be trivialized as an "infirmity," we feel his argument overlooks the core of the holding in Duff-Smith and Henderson, namely, that on habeas review we look to only the trial and direct appeal.

never aimed. I am not a target–or nothing like that sir. I don't know how to shoot a gun like that

... I didn't–I didn't mean to hurt nobody, sir. I'm not a killer, sir.'" Mathis' trial counsel argued that

Mathis' testimony demonstrated a mental state of recklessness in the killing of Hibbard and therefore,

a manslaughter instruction should be given. Mathis' testimony went against the great weight of the

evidence and the surviving eyewitnesses' testimony that he was calm and calculated when he shot

Hibbard. The trial court denied trial counsel's request; instead the trial court instructed the jury it

could return a conviction of capital murder or murder.

In Beck, the Supreme Court invalidated an Alabama statute that prohibited the trial court from

giving a lesser included offense instruction in a trial for a capital crime. As the Supreme Court later

explained in Schad v. Arizona, Beck sought to prevent a scenario where a jury, convinced that a

defendant was guilty of a serious, violent crime but not sure that he was guilty of a capital crime, was

faced with a situation where they had to vote for a capital conviction or let the defendant go free.

501 U.S. 624, 646 (1991) (quotation marks omitted).

> '[O]n the one hand, the unavailability of the third option of convicting on a lesser
> included offense may encourage the jury to convict for an impermissible reason--its
> belief that the defendant is guilty of some serious crime and should be punished. On
> the other hand, the apparently mandatory nature of the death penalty [in Alabama]
> may encourage it to acquit for an equally impermissible reason--that, whatever his
> crime, the defendant does not deserve death.... [T]hese two extraneous factors ...
> introduce a level of uncertainty and unreliability into the factfinding process that
> cannot be tolerated in a capital case.' We repeatedly stressed the all-or-nothing nature
> of the decision with which the jury was presented. . . . As we later explained in
> Spaziano v. Florida, 468 U.S. 447, 455 (1984), '[t]he absence of a lesser included
> offense instruction increases the risk that the jury will convict ... simply to avoid
> setting the defendant free.... The goal of the Beck rule, in other words, is to eliminate
> the distortion of the factfinding process that is created when the jury is forced into an
> all-or-nothing choice between capital murder and innocence.' This central concern
> of Beck simply is not implicated in the present case, for petitioner's jury was not faced
> with an all-or-nothing choice between the offense of conviction (capital murder) and
> innocence.

Id. at 646-47 (internal citations omitted).

In Schad, the trial court gave a jury instruction for the non-capital offense of second-degree murder. The petitioner argued that the jury should have been given an instruction for simple robbery. The Schad Court rejected the petitioner's argument, concluding that as long as the jury had an option other than capital conviction or acquittal, even if that third option was second-degree murder and not robbery, the jury's capital murder verdict did not implicate a Beck violation. Id. at 647.

Here, the jury found Mathis guilty of capital murder under Texas Penal Code § 19.03(a)(7) for the murder of more than one person during the same criminal transaction. Mathis argues that a capital murder charge under § 19.03(a)(7) is really two murder convictions plus an affirmative finding of the same transaction. He argues that Beck must be applied to each homicide in his capital murder charge. He contends that the jury was faced with the all or nothing dilemma of either convicting Mathis under a higher mental state for Hibbard's murder or letting him go free for that killing, and thereby, under Beck, the trial court violated his constitutional rights when it did not allow the jury to consider the lesser included offense of manslaughter as to Hibbard. A finding of recklessness as to the killing of Hibbard would necessarily negate one of the elements required to convict him of capital murder.[2]

The Court of Criminal Appeals rejected Mathis' argument because it held that his trial testimony alone did not present enough evidence for the jury to rationally find that his shooting of

---

[2] Mathis also argues that the jury charge presented a problem akin to the one in Penry v. Johnson, 532 U.S. 782 (2001), in that, without a manslaughter instruction, jurors who did not believe that one murder conviction fully addressed the fact of two killings would have to nullify a truthful finding that the petitioner killed Hibbard in order to compromise on a verdict which only held him accountable for the murder of Brown. However, the jury instruction here was not internally contradictory nor did it present the ethical dilemma faced by jurors instructed under the unconstitutional charge in Penry. We therefore reject this argument.

Hibbard was simply reckless. The Court of Criminal Appeals held that a lesser included offense instruction should only be given by a trial court where a valid rational alternative to a capital conviction can be found in light of all the evidence. The district court affirmed, holding that the state court ruling was not contrary to, or an unreasonable application of, federal law. In addition, the district court read <u>Beck</u> as prohibiting a situation where the jury was faced with only two choices, either convict the defendant of a capital offense or acquit. Under that interpretation, no constitutional violation occurs if the trial court provided the jury with the option of convicting the defendant of a non-capital offense. Because, the jury was given the option of convicting Mathis of a non-capital offense, the district court concluded no constitutional violation occurred, even if the trial court denied a specific lesser-included offense instruction. We agree with the district court's latter conclusion.

The crux of Mathis' argument is parallel to that presented by the petitioner in <u>Schad</u>. <u>Id.</u> at 646-48. The petitioner there was charged with murder committed during the course of a robbery, a capital offense, but he maintained that he was guilty of only simple robbery. The jury was instructed on capital murder and second-degree murder. Schad argued that if the jury believed his defense theory, and thought him guilty of only robbery, there was no verdict through which they could express that view; the jury was therefore faced with either convicting him of murder or letting him go free. The Supreme Court rejected the petitioner's argument that "the jurors should have been given the opportunity to return a verdict in conformity with their reasonable view of the evidence." <u>Id.</u> at 647 (internal quotation marks and citation omitted). The assertion that a petitioner is entitled to instruct the jury on every lesser included offense supported by the evidence, the <u>Schad</u> Court said, is a misapprehension of the constitutional principles in <u>Beck</u>. <u>Id.</u> at 646. Instead, the <u>Schad</u> Court reiterated that the goal of <u>Beck</u> was to eliminate an all or nothing choice between capital conviction

11

or innocence.  Id.

Here, the trial court gave instructions as to capital murder, murder, and self-defense.  Thus, the jury was not faced with a situation where they might be "convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime [and] might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all."  Id.  Here, if the jury believed that Mathis was guilty of a serious, violent crime but did not want to impose the death penalty, they had the choice of imposing a sentence of murder.  Because this conclusion is not one about which reasonable jurist could differ, we decline to issue a COA.

IV.    Competency hearing

Mathis's fourth claim concerns his contention that the trial court violated his due process rights in failing to conduct a competency hearing *sua sponte* during trial.  Mathis bases his procedural competency argument on one central incident at trial.  Mathis' defense theory depended on his explanation of the shootings.  When Mathis was called to testify he initially stated that he was not present at the house when the murders occurred, to the surprise of his attorney and against the great weight of the evidence.  Trial counsel immediately requested a recess so that he could consult with Mathis.  Counsel also suggested to the trial court that this "breakdown in communications" may be attributable to Mathis' well-documented history of "some mental problems, some episodes, some trauma to him."  After a brief break, Mathis returned to the witness stand.  He admitted he had lied about not being at the house at the time of the shootings.  He stated that "the reason why I lied is because I was already on probation and everything and I knew–I knew exactly what I would face if I told the truth about me being there.  I was lying because, because I was scared."  Mathis argues that

12

his illogical lie, especially considering that his defense strategy hinged on his testimony, suggested that he did not grasp the gravity of his situation and he did not appreciate the need to cooperate with trial counsel, which he asserts indicated his incompetency. On habeas review before this court, Mathis makes only a claim for a procedural error for failure to ensure competency not a substantive claim that he was actually incompetent.

Constitutional due process requires that the trial of an accused may be conducted only when they are legally competent. See Pate v. Robinson, 383 U.S. 375 (1966). A court must *sua sponte* conduct an inquiry into a defendant's mental capacity if the evidence raises a *bona fide doubt* as to the defendant's competency. See Drope v. Missouri, 420 U.S. 162 (1975); see also Lokos v. Capps, 625 F.2d 1258 (5th Cir. 1980). In considering whether a hearing should have been conducted into the defendant's mental status, "[t]he question is: Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." Id. at 1261. The test to determine whether a Pate procedural violation has occurred is an objective one based on what was known to the trial court at the time of the trial. Id. (citation omitted). The Supreme Court has not articulated a precise standard for what should indicate a bona fide doubt, but generally the Court focuses on three factors that should be considered: (1) the existence of a history of irrational behavior, (2) defendant's demeanor at trial, and (3) a prior medical opinion. See e.g., Drope, 420 U.S. at 180. Even one of these factors, standing alone, may be sufficient to signal a constitutional violation. Id.

The state habeas court held that there was insufficient evidence to raise a bona fide doubt as

13

to Mathis' competency to stand trial. The state court noted there was strong indicia of Mathis' competency, namely his demeanor at trial and the examinations by two mental health experts who did not challenge his competency. The district court further noted that two ex parte hearings were held apparently for the purpose of determining Mathis' competency. Although the record does not indicate what rulings resulted from those hearings, Mathis was apparently found competent. The district court concluded that Mathis failed to demonstrate objective facts known to the trial court during trial which would have signaled any doubt as to his competency. Our review of the trial record also indicates that Mathis understood the nature of the proceedings, and otherwise acted competently; accordingly, we can not issue a COA.

The only evidence Mathis points to that he argues should have raised a "red flag" concerning his competency is the statement made by trial counsel concerning Mathis history of mental problems and the "illogical lie" Mathis told at trial that he was not present at the house at the time of the shootings. First, vague statements made by defense counsel of mental problems, without additional evidence, are not sufficient to raise a bona fide doubt of competency. See Pedrero v. Wainwright, 590 F.2d 1383, 1388 (5th Cir. 1979) (quoting Jordan v. Wainwright, 457 F.2d 338, 339 (5th Cir. 1972) (finding defense counsel's "naked suggestion that the defendant may be incompetent" insufficient to warrant a competency hearing)). Moreover, Mathis' lie, although illogical and probably detrimental to his case, was not sufficient to raise a bona fide doubt as to his competency. Accord Davis v. Woodford, 384 F.3d 628, 645-46 (9th Cir. 2004) (holding that although defendant's behavior was recalcitrant and detrimental to his case, the trial judge did not err in not conducting a competency hearing where the defendant otherwise demonstrated he understood the proceedings and what was at stake). Mathis rationally explained why he lied, he was scared. Furthermore, in his

14

explanation he explicitly stated he "knew exactly what [he] would face" if he told the truth, thus demonstrating that he had a "'rational as well factual understanding of the proceedings against him.'" Godinez v. Moran, 509 U.S. 389, 396 (1983) (citation omitted). We therefore cannot justify the issuance of a COA.

V.      Withholding of Impeachment Evidence

Mathis claims the prosecution violated his constitutional rights by failing to reveal evidence that could have been used to impeach Gregory Jackson, a prosecution witness. Jackson testified that he and Mathis were incarcerated together while Mathis was awaiting trial. He alleged that Mathis confessed to the killings and expressed no remorse. Even more damaging, Jackson alleged that Mathis stated "the only thing he [Mathis] resented is that he didn't kill everybody that was in the house." Mathis asserts several pieces of evidence were improperly withheld, specifically (1) the full extent of Jackson's criminal record; (2) that Jackson had repeatedly contacted the district attorney's office, seeking an opportunity to testify for the prosecution against other defendants; (3) any offers that might have been made to Jackson in return for his testimony; and (4) that there might be some questions as to Jackson's mental capacity and the prosecution in another context had earlier questioned Jackson's credibility; and (5) the testimony of other cellmates who could refute Jackson's testimony.

The district court concluded that Mathis failed to show that the State did not turn over all materials in its possession to him or that Mathis could not have obtained such evidence with reasonable and diligent effort. Furthermore, even assuming the prosecution had withheld evidence, the district court concluded that Mathis did not show that the evidence was material to his conviction or sentence because Jackson's testimony was only a small portion of the significant evidence

15

presented by the State.

The Supreme Court in Brady v. Maryland held that the suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Three factors must be present to constitute a Brady violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Banks v. Dretke, 540 U.S. 668, 691 (2004) (quoting Strickler v. Greene, 527 U.S. 263, 281- 82 (1999)). Unless the "evidence is 'material for Brady purposes, [its] suppression [does] not give rise to sufficient prejudice to overcome [a] procedural default.'" Id. at 698 (quoting Strickler, 527 U.S. at 282). In order to prove materiality, the defendant must show that with the suppressed evidence there is "a reasonable probability of a different result." Id. (quoting Kyles v. Whitley, 514 U.S. 419 (1995)).

"[W]hen information is fully available to a defendant at the time of trial and his only reason for not obtaining and present ing the evidence to the Court is his lack of reasonable diligence, the defendant has no Brady claim." United States v. Brown, 628 F.2d 471, 473 (5th Cir. 1980). Brady does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case. United States v. Marrero, 904 F.2d 251, 261 (5th Cir. 1990) (citations omitted).

The State argues that no evidence was suppressed because all of the evidence challenged by Mathis was either in the prosecution's open file, part of the public record, or inadmissible. Mathis counters that while "in theory [trial counsel] could have combed through sealed records" looking for

16

the evidence they say was suppressed, they would not have known where to look "without some guidance by the prosecution."

Mathis' argument is unavailing. It is well established that the prosecution has no duty under Brady to give defense counsel guidance as to where in the prosecution's open file to find exculpatory evidence. United States v. Mulderig, 120 F.3d 534, 541 (5th Cir. 1997) ("'There is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents with a larger mass of material that it has already turned over.'"); see also Marrero, 904 F.2d at 260-61. The evidence in the prosecution's open file was not suppressed because Mathis' counsel had equal access to it.

However, we find unpersuasive the State's argument that they had no duty to disclose exculpatory evidence that was available in the public record. Specifically, the State contends that Jackson's competency evaluation and evidence that he tried to claim he was incompetent in a previous trial, were available in his file in the district clerk's office. In addition, Jackson's file also contained evidence that he previously tried to act as a confidential informant in other cases but he was repeatedly rebuffed by the State because they questioned his credibility. As the Supreme Court has previous noted, when a prosecutor asserts they have complied with Brady through their open file policy, defense counsel may reasonably rely on that file to contain all the relevant exculpatory materials the state is obligated to disclose pursuant to Brady. Strickler v. Greene, 527 U.S. 263, 283 n.23 (1999) (quotation marks omitted); accord Banks, 540 U.S. at 694-96. "If the State failed under a duty to disclose the evidence, then its location in the public record, in another defendant's file, is immaterial." Johnson v. Dretke, 394 F.3d 332, 337 (5th Cir. 2004) (citation omitted). In Johnson, a murder accomplice, who was also a witness at the accused's trial, stipulated under oath that he shot

17

the victim; the accused did not know at trial about the accomplice's stipulation. The district court relied on the fact that the stipulation was available in the public record to hold that a counsel exercising due diligence could have discovered it. The Fifth Circuit reversed the district court's denial of COA because we found that reasonable jurists could debate whether it was prosecutorial misconduct to not disclose the stipulation to the accused. Id.

Even though the evidence pointed to by the defense may have been improperly withheld by the State, no Brady violation can be found if the evidence is not material, i.e., unless there is a reasonable probability there would have been a different result at trial. At the guilt/innocent phase of the trial, Jackson testified that Mathis confessed to shooting Brown and Hibbard. Additionally, there was significant evidence at trial that Mathis shot Brown and Hibbard, including Mathis' own testimony and the testimony of the surviving eyewitnesses. Thus, even if Mathis could have further impeached Jackson's testimony at the guilt/innocence phase, it would not have "'put the whole case in such a different light.'" Banks, 540 U.S. at 698 (citation omitted).

Jackson also testified Mathis said he regretted that he did not kill everybody in the house. The prosecution repeated Jackson's statement at the sentencing phase twice, during opening and closing statements. The jury was required to answer two special questions at the sentencing phase: (1) whether they found from the evidence, beyond a reasonable doubt, that there is a probability the Defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (2) whether they found there was sufficient mitigating circumstances to warrant the imposition of a sentence other than death. The jury answered yes to the first question and no to the latter. Mathis argues that Jackson's testimony was critical evidence that painted Mathis as a remorseless and cold-blooded killer who posed a continuing threat to society. However, the

18

prosecution also put forth witnesses who testified as to Mathis' prior criminal history –including a girlfriend he assaulted, police officers who he assaulted, and teachers who kicked him out of high school for disciplinary problems. In addition, a corrections officer testified to Mathis' ongoing disciplinary problems in jail during the course of the trial and the nurse of Mathis' paralyzed victim, Almaguer, testified to the measures necessary to keep her alive on a day-to-day basis. Although Jackson's averment–that Mathis was remorseless–was damning, we agree with the district court that there was sufficient evidence independent of Jackson's testimony for the jury to find that Mathis posed a continuing threat of violence. We find that reasonable jurists could not debate this conclusion, and decline to issue a COA.

VI.     Ineffective Assistance of Counsel

Mathis' other claims relate to his assertion that his trial counsel's performance was ineffective. Mathis argues that his trial counsel failed to (1) discover impeachment evidence against Gregory Jackson; (2) object to testimony by Esmerelda Lester, a surviving eyewitness from the shootings, when she stated that she heard that "there was a hit on [her] head;" (3) object when the prosecution called Mathis "a despicable piece of human trash;" (4) investigate and develop mitigating evidence that he had a low IQ; and (5) present expert testimony that he suffered from frontal lobe damage. We address each one in turn.

To make a substantial showing of the denial of his Sixth Amendment right to reasonably effective assistance of counsel, Mathis must demonstrate "that counsel's performance was deficient," and that "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984). To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. Judicial scrutiny

19

of counsel's performance must be "highly deferential" and we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

A.      Failure to investigate impeachment evidence

The district court affirmed the state habeas court's conclusion that Mathis' trial counsel's pre-trial investigation of impeachment evidence was not ineffective. Furthermore, the district court averred that even if trial counsel should have investigated Jackson's background more thoroughly, there was no indication that the deficiency prejudiced the defense. The jury was well-aware that Jackson had a criminal record because it was mentioned in both direct and cross examination. The district court observed that trial counsel vigorously cross-examined Jackson, calling him a thief, a burglar, a robber, a cheater, and a liar. Accordingly, the district court held that there was not a reasonable probability that there would have been a different outcome had trial counsel more thoroughly tried to impeach Jackson's testimony.

Our review of the record likewise indicates that trial counsel thoroughly challenged Jackson about his credibility during cross-examination. Mathis argues that counsel should have been aware of the impeachment evidence concerning Jackson that was available in the public record. However, as previously noted, the Supreme Court has stated that defense counsel may reasonably rely on a prosecutor's open-file to contain all relevant exculpatory materials the state is obligated to disclose when a prosecutor asserts they have complied with Brady through their open-file policy. Strickler,

20

527 U.S. at 282 n.23. Mathis' counsel was not ineffective in failing to find the information about Jackson that was not contained in the prosecutor's open-file, even if that information was available in the public record. However, even if trial counsel was obligated to discover the impeachment evidence against Jackson, reasonable jurists could not disagree that there is no probability that there would have been a different result at trial. See Section V, *supra*. We therefore decline to issue a COA.

        B.      Failure to object to Lester's testimony

Mathis argues that his trial counsel was ineffective for failing to object to certain comments made during the guilt-innocence phase of the trial by Emeralda Lester, a surviving eyewitness and mother of paralyzed victim Melanie Almaguer. On direct examination, the prosecutor asked Lester where she had been living since the shooting. Lester responded that she had been living "[f]rom motel to motel" because she was in hiding. The prosecutor replied, "Why?" to which Lester stated, "Because it was on the streets that there was a hit on my head." Mathis asserts that Lester's comment implied that he may be responsible for a serious extraneous offense–namely, solicitation of the murder of a witness, in order to preclude Lester from testifying against him. Mathis contends that Lester's testimony, in tandem with Jackson's testimony, implied that he was remorseless and violent. Furthermore, Mathis argues that had his trial counsel objected to Lester's testimony, it would have warranted a mistrial.

The district court concluded that Mathis failed to show that an objection to Lester's testimony would have created a reasonable probability of a different result, especially in light of the significant independent evidence establishing that Mathis had a violent criminal history and displayed no remorse. Although the gravamen of Mathis' argument is that Lester's testimony affected the jury's decision

21

in sentencing, the testimony itself occurred during the guilt-innocence phase of the trial. Even assuming that the jury retained this information as part of their sentencing deliberations, the district court noted that Lester did not state that Mathis was responsible for the "hit on [her] head," nor that the "hit" was a direct result of the shootings or the trial.

We agree, and find that reasonable jurists could not disagree with the district court's conclusion. In addition, we note that Mathis himself admits that there was evidence, independent of Lester's vague comment, that could have established that Mathis was remorseless and violent. Mathis' brief states that Lester's testimony "dovetailed with Jackson's testimony about the petitioner's supposed 'regret'" and "Lester's testimony, like Jackson's, provided strong evidence of an ongoing 'remorseless' attitude and tendency towards violence." We thereby can not issue a COA.

C.    Failure to object to prosecutor's statement

Mathis objects to the prosecutor calling him "a despicable piece of human trash" during closing statements and asserts that his trial counsel was ineffective for failing to object to the prosecutor's use of language. He contends that the jury is likely to be influenced by an experienced prosecutor's personal opinion. He also argues a characterization that he is trash implies that he deserves to be discarded, i.e., that he deserves to die. The district court concluded that Mathis failed to show that the failure to object resulted in prejudice or made the proceedings fundamentally unfair. Trial counsel had also used trenchant language in closing arguments in reference to the victims, which the state habeas court concluded could have justified an equally vitriolic response from the prosecution; the district court held that the state habeas court's conclusion was not contrary to or an unreasonable application of federal law.

The prosecutor's comment was very likely an impermissible interjection of his personal beliefs

22

into the closing arguments, however, we are unconvinced that a COA should be issued. Even if trial counsel had objected, the statement would not have constituted reversible error. See e.g., United States v. Hayes, 444 F.2d 472, 474 (5th Cir. 1971) ("Because of the overwhelming evidence of guilt, it can hardly be said that appellants were prejudiced in the minds of the jury by the prosecutor's comment. Even taking the view most favorable to appellants, such remarks do not constitute the type of 'obvious and substantial' error which would be grounds for reversal."); see also United States v. Shaw, 701 F.3d 367 (5th Cir. 1983) (prosecutor's comment [he had never seen a "colder, more cold blooded, remorseless defendant"] did not prejudicially affect defendant's substantial rights considering overall strength of evidence against him and failure of prosecutor to convey impression that he possessed private or extrinsic information supporting belief.). In light of the overwhelming evidence presented of his guilt, there is no probability that an objection from trial counsel would have resulted in a different outcome at trial.

D.      Failure to investigate low intelligence/mental retardation.

The evidence presented to the state trial court showed Mathis to have a low range of intelligence but all above the threshold for mental retardation. Specifically, the expert's report indicated that Mathis' full scale I.Q. was 79, his verbal I.Q. was 77 and his performance I.Q. was 85. Testing performed by a psychologist for the Texas Department of Criminal Justice after his conviction reflect different results. Those results show Mathis to have a full scale I.Q. of 62, verbal I.Q. of 65 and a performance I.Q. of 60. The district court held that Mathis failed to present evidence that reasonable counsel, at the time of trial, would have investigated his possible mental retardation further. Nonetheless, the district court concluded that even without the evidence of mental retardation, trial counsel "covered the same ground" in presenting evidence that Mathis' drug use

impaired his ability to reason and function normally; thus there is no reasonable probability that evidence of mental retardation would have changed the result.

We decline to issue a COA on this issue because trial counsel did not fall below objective standards of reasonableness in their investigation of Mathis' intelligence. It is not asserted that trial counsel *failed* to investigate mental capacity. Cf. Wiggins v. Smith, 539 U.S. 510 (2003) (finding Strickland claim meritorious where counsel failed to conduct an adequate investigation into defendant's background). To the contrary, Mathis took an I.Q. test prior to trial and scored low, but above the threshold for mental retardation. Mathis makes no argument that a reasonable counsel at the time of trial would have investigated further. It is a mystery how Mathis could have scored 10-20 points higher on his I.Q. test before trial as compared to after his conviction. However, trial counsel was not deficient in their performance to trust the results of the initial I.Q. tests.

E.      Mitigating evidence of frontal-lobe damage

Mathis presented an affidavit from Pheobe Smith, who along with lead counsel, Steven Rosen, was Mathis' counsel at trial. Smith averred that in her investigation of mitigation evidence, she interviewed Dr. Stephen Martin, Ph.D., a neurological expert. Based on neurological tests performed by Dr. Martin's associate, Dr. Martin was prepared to testify that Mathis had frontal lobe brain damage and that the brain damage impaired Mathis' ability to think and function normally, particularly when under stress. Smith stated in her affidavit that she did not known why Steven Rosen chose not to present this potentially mitigating evidence and she felt that it was ineffective assistance of counsel to not present the testimony of Dr. Martin.

"[C]ounsel's failure to develop or present mitigating background evidence is not per se deficient performance. . . . *Strickland* requires that we defer to counsel's decision not to present

24

mitigating evidence or not to present a certain line of mitigating evidence when that decision is both fully informed and strategic, in the sense that it is expected, on the basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense." Moore v. Johnson, 194 F.3d 586, 615 (5th Cir. 1999) (internal citations omitted). The state habeas court held that trial counsel's decision not to put Dr. Martin's evidence before the jury was part of sound trial strategy and did not fall below an objective standard of reasonableness. The district court determined that the state habeas court did not fully adjudicate the claim on its merits because it did not consider the prejudice prong of the Strickland analysis, and consequently the prejudice prong may be reviewed de novo. See Henderson, 333 F.3d at 600-01(finding that the ADEPA's standard of review does not apply to the deficient performance prong of Strickland claim because the state court did not address that part of petitioner's claim).

Without addressing the question of whether trial counsel was deficient for not presenting Dr. Martin's evidence, on de novo review the district court concluded that Mathis did not satisfy the prejudice prong of the Strickland analysis. After noting that Mathis stated that his frontal lobe damage was not caused by a physical injury but was instead attributable to his drug use, the district court concluded that trial counsel presented other mitigating evidence with the same "mitigating thrust." Specifically, the district court stated that the testimony of Dr. Jesse A. Reed, a psychologist who testified about the effect drug abuse had on Mathis, was similar in kind to Dr. Martin's averments because they both would have presented to the jury facts stating that drugs impaired Mathis' judgment and contributed to his criminal history. Accordingly, the district court held that there was no reasonable probability of a different result because the jury was able to consider evidence with the same mitigating effect. We agree, and further find that reasonable jurists could not

25

debate this point; therefore, we deny a COA.

## Conclusion

For the reasons outlined above, Mathis' request for a COA is DENIED.  Additionally, Mathis' motion for stay of execution is DENIED and Mathis' motion for stay of proceedings is DENIED.